UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| UNITED STATES, | : | |
| Plaintiff | : | |
| | : | Crim. No. 15-109 (JHS) |
| v. | : | |
| DEAN ROSSI, | : | |
| Defendant | : | |

**DEFENDANT'S SENTENCING MEMORANDUM**

In anticipation of his sentencing on April 29, 2019, defendant Dean Rossi submits this memorandum.

I.     OBJECTIONS TO GUIDELINES COMPUTATION

The defendant objects to a number of the conclusions reached in the Final Presentence Report and asks that the Court calculate the offense score differently.

    A. The Structure of the Fraud Loss Guideline

The principal factor that will drive defendant Rossi's Total Offense Level is the calculation of the "loss" suffered by the victims of his alleged conduct. Section 2B1.1(b)(1) provides that points are added to the Base Offense based upon the amount of the "loss." The PSR adopts the government's contention that this figure was $2,505,719.12, resulting in a 16-level increase in Rossi's Offense Level. PSR ¶51.[1]

Rossi objects to the conclusions in the PSR concerning the loss calculation for two

---

[1] Section 2B1.1(b)(1)(I) directs that 16 points be added if the loss was greater than $1.5 million and less than $3.5 million.

1

reasons, both of which relate to credits to which he is entitled under Application Notes 3(E)(i), (ii) and (iii) to Guidelines section 2B1.1.

First, Note 3(E)(i) provides that:

Loss shall be reduced by the following:
(i) The money returned, and the fair market value of the property returned and the services rendered, by the defendant or other persons acting jointly with the defendant, to the victim before the offense was detected. The time of detection of the offense is the earlier of (I) the time the offense was discovered by a victim or government agency; or (II) the time the defendant knew or reasonably should have known that the offense was detected or about to be detected by a victim or government agency.

In this case, the three companies owned by the defendant returned substantial amounts of money to the alleged victim banks between the dates the loans were taken out and when the alleged fraud was discovered in the form of the agreed upon, proper monthly payments on the mortgages. The amount and length of time these payments were made can be established with the requisite certainty.

B. The Proper Guidelines Computation

In this case, the three companies owned by the defendant returned substantial amounts of money to the alleged victim banks between the dates the loans were taken out and when the alleged fraud was discovered in the form of the agreed upon, proper monthly payments on the mortgages. The amount and length of time these payments were made can be established with the requisite certainty.

For the First Cornerstone loan, it is established that the closing on the loan took place on October 5, 2007. (PSR ¶28). First Cornerstone ledgers produced by the government in discovery (Exhibit A attached) show the monthly amount of the payments ($9699.19) and the beginning and end dates of the sequence, December 1, 2007 and August 1, 2008, for a total of 21 payments.

The Nova Bank loan closed on March 29, 2007 (PSR ¶11). Although the government did

2

not produce Nova records like First Cornerstone's, there is no question that the normal procedure would have been for the first monthly payment to be due no later than May 1, 2007. A Royal Bank forbearance agreement produced by the government (Exhibit B) establishes that the monthly payment amount was $12,873.33 and that the last payment (a partial one of $10,000) was made on December 1, 2009. Thus, a total of 31 full payments were made.

Finally, the Leesport Bank loan closed on January 21, 2008 (PSR ¶36), meaning that the first payment would have been due no later than May 1, 2008. The note (Exhibit C) shows the amount of the monthly payment. Although no documents establish the date of the last payment with absolute certainty, Mr. Rossi is certain it was quite close to the date of the last Nova payment, which occurred in December 2009.

Thus, the following is an accurate summary of the payments made by Rossi's companies on the three loans:

| Bank Receiving Payments | Beginning & End Dates of Payments | Total Number of Payments | Amount of Each Payment | Total |
| --- | --- | --- | --- | --- |
| First Cornerstone | 12/1/07-8/1/08 | 21 | 9,699.19 | 203,682.99 |
| Nova Bank | 5/1/07-12/1/09 | 31 | 12,873.33 | 399,073.23 |
|  | Partial payment |  |  | 10,000.00 |
| Leesport Bank | 5/1/08-12/1/09 | 23 | 9,420.13 | 216,662.99 |
|  |  | Grand Total Paid |  | **829,419.21** |

Second, Application Note 3(E) to section 2B1.1 is entitled "Credits Against Loss." Sections (ii) and (iii) of that note specify that the defendant in a mortgage fraud case is entitled to have the loss figure reduced by "the amount the victim has recovered at the time of sentencing from disposition of the collateral" or "if the collateral has not been disposed of by the time of

3

sentencing, use the fair market value of the collateral as of the date on which the guilt of the defendant has been established, whether by guilty plea, trial or plea of *nolo contendere*." Further, "there shall be a rebuttable presumption that the most recent tax assessment value of the collateral is a reasonable estimate of the Fair Market Value."

A comparison of information submitted to the Probation Office by the banks and their successors with public record information demonstrates (a) that the banks actually recovered significantly more than they claim, (b) that two of the banks utterly failed to make reasonable efforts to recover losses through the disposition of collateral, and (c) that Rossi is entitled to substantial credits for collateral that the banks never disposed of. Moreover, the actions taken by one bank in apparent complicity with the government's star trial witness raise serious questions about the reliability of that bank's loss claims entirely.

1. First Cornerstone Bank
   (now First Citizens Bank & Trust Company)

With a single limited exception, the efforts undertaken by First Cornerstone demonstrate that the other victims in this case would have suffered losses that were a small fraction of what they claim if they expended even a small modicum of effort. Their failure to do so should not result in the wildly inflated loss figures in the PSR.

The PSR notes that First Cornerstone recovered approximately 90 percent of the amount it loaned to St Charles Place LLC through foreclosures on the properties covered by the mortgage. Consequently, the total loss claimed by the bank was $110,000 on a $1.3 million loan. PSR ¶43(b).

Although the government alleged in its statements to the Probation Office that the defendant had already been credited with payments made to the banks after the closings but

4

before he was indicted, this appears not to be the case with First Cornerstone. Paragraph 43(b), which relates the computation of First Cornerstone's fraud loss, reads:

> The defendant sought a $1.3 million loan from First Cornerstone (now First- Citizens Bank & Trust Company), and he received for the same amount. Of this amount, First Cornerstone charged off $110,000 and that amount was taken over by the FDIC. *Therefore, the FDIC sustained a loss of $110,000*. The remaining $1,190,000 was reportedly recovered by First Citizens Bank & Trust Company through the resale of properties.

It is apparent[2] that Rossi was give no credit in this computation for the $203,682.99 in payments that were made by St. Charles Place LLC at Rossi's behest between December 2007 and August 2008. If these payments are credited, it is apparent that neither First Cornerstone nor the FDIC actually suffered any Guidelines loss at all.

Moreover, one of the properties mortgaged to First Cornerstone was 2834 W. Lehigh Avenue. First Cornerstone took no action whatsoever to foreclose on this property. Rossi is certain of this since St. Charles Place continues to hold title to the property. The assessed value of the property is $50,400, an amount that should be credited to Rossi under the Application Notes.

Finally, First Cornerstone's experience demonstrates unequivocally what would have occurred if the other two banks and the FDIC had exercised any effort. First Cornerstone was able to recover virtually the entire face amount of the loan from foreclosure sales, and might well have recovered it all had they foreclosed on the Lehigh Avenue property.

---

[2] The $110,000 loss figure was derived by subtracting the $1,190,000 recovered in "resales" (presumably foreclosures) from the original loan amount of $1.3 million.

5

2. Leesport Bank/VIST Bank

The PSR recites that "Leesport/VIST still sustained a loss of $350,000" even after being compensated by Fidelity Title. PSR ¶43(c). According to the government, the total loss to this bank was actually $224,201.56. Attached as Exhibit D is a December 12, 2018 email and attached schedule confirming this figure. Thus, there is no dispute but that the loss figure of $350,000 in paragraph 46(c) must be reduced to $224,201.56.

The balance of the alleged loss attributable to the Leesport/VIST loan relates to Fidelity Title's $850,000 reimbursement of the balance of the bank's losses. Without any documentary or financial support, paragraph 46(c) of the PSR recites that "Fidelity then mitigated its losses through the sale of seven properties and a $40,000 settlement with George Abbott, but *Fidelity still sustained a loss $702,802.31."* When Rossi's counsel asked the government for any material supporting Fidelity's claim, the government produced only the document attached as Exhibit E. Defense counsel has been unable to find any entries in this document that support Fidelity's claim.

What then is the true amount of Guidelines "loss" attributable to Fidelity's payment to VIST and Fidelity's attempts to sell the collateral to offset that payment? The schedule attached as Exhibit F provides the answer. The source of the information on the schedule is public records that follow the schedule. They are, first, records of the foreclosure sales of certain of the properties by an entity known as "PBB."[3] The sales prices of these properties are listed in the "Recovered by Fidelity" column as they are cash sums actually recovered by Fidelity which total $247,101.

---

[3] Neither Fidelity, the Probation Office nor the government describe the role of PBB. Instead, the simply claim that "Fidelity" sold these properties. For more on PBB, see the discussion in the Nova Bank section below. However, Rossi asks the Court to direct the government to provide an explanation of these discrepancies with supporting documentation, a clear description of who owned and controlled PBB, and financial accounting.

6

Next, there are five properties at the top of the schedule, the current assessed values of which are listed in the "Never Foreclosed" column, which totals $257,200. These are properties that neither VIST nor Fidelity ever made any attempt to foreclose or sell. The Application Notes of the Loss Guideline make clear that the loss assigned to Rossi should be reduced by this amount. By way of information, Rossi is prepared to arrange for these properties to be deeded to whoever VIST, Fidelity or the government designates before or after settlement in order that they may be sold and the proceeds paid to the party designated.

Finally, there are seven properties for which the notes read "FNMA sold", "Bank of America sold" or "Deutsche [presumably Deutsche Bank] sold." These are properties on which first mortgages were never paid off at the time the Leesport/VIST loan closed, and which were therefore encumbered by two mortgages. From a review of the sales records, it appears that these properties were foreclosed by the first lienholders and the amounts due to those first lienholders were paid from the foreclosure sale. However, in each such proceeding, Leesport/VIST would by law have been notified of the foreclosure action and given the opportunity to participate. By deciding not to do so, the bank abandoned the remaining equity it could have recovered, measured by the difference between the property's assessed value and the amount recovered by the first lienholder. For example, the records establish that 1315 Adams was sold by FNMA, presumably at a foreclosure sale, for $21,000, likely the amount of the first lien on the property. FNMA would have had no reason to seek a sales price exceeding the amount of its assignor's lien. Notwithstanding that the assessed value of the property was $75,900, leaving $51,900 in equity, neither Leesport/VIST nor Fidelity intervened in the foreclosure to recover the balance owed them. Applying the principles of the Application Notes, Rossi is entitled to credit for the amount so abandoned by the bank. These amounts appear in the column headed "Equity Abandoned After 1st Lien Satisfied" and total $360,474.

_____

Adding the "Recovered," "Never Foreclosed," and "Equity Abandoned" sums yields a total of $865,775, which exceeds the $850,000 paid by Fidelity to VIST, leaving no Guidelines Loss attributable to the Fidelity transaction. The only "Loss" related to the Leesport/VIST loan that should be included in the Guidelines computation is the $224,201.56 sustained by the bank itself.

3. Nova Bank

The greatest claimed loss amount, a $1,434,916.81 loss allegedly sustained by the FDIC, relates to a $1.65 million loan from Nova Bank.[4] The schedule attached as Exhibit G quantifies the fallacies in the FDIC's claims and shows that the true loss is virtually nil.

First, the Nova claim, attached to the FDIC letter of July 24, 2018, states that only $248,115.88 was "recovered" from sales of 15 foreclosed properties by "Nova" or "FDIC." In fact, public record information shows that the actual total recovered in cash was $329,500. This documentation follows Exhibit G and is totaled in the column "Recovery per Public Record."

More disturbing is the fact that the FDIC claims in its schedule (Exhibit H) that all of the properties were sold by "FDIC" or "Nova Bank." The public record information shows that **all** of the properties were in fact sold by "PBB," an entity not mentioned by the FDIC. The little information that the defendant has been able to glean concerning PBB comes principally from the public "LinkedIn" resume of former Nova/PBB employee C. Kim Hartline) (Exhibit I), who appears to have been the spouse of Brian Hartline, the CEO of Nova Bank, during her term with the bank.[5]

---

[4] The very fact that Nova allegedly lost 86 percent of the face amount of its loan while First Cornerstone recovered over 90 percent of its loan on quite similar collateral itself suggests that the former's loss claim (made by the FDIC) is questionable.

[5] Brian Hartline and another executive at the bank were convicted of defrauding the Troubled Asset Relief Program by misstating the nature of certain investments in the bank. Hartline and his associate's actions caused the bank to fail. US v. Hartline, Cr. No. 14-548 (E.D.P.A.)

8

Ms. Hartline *simultaneously* held a number of very significant positions at the bank, including Corporate Secretary and Company Administrator ("Responsible for all areas of corporate governance for NOVA Financial Holdings, Inc., NOVA Bank, NOVA Trust Company, NOVA Capital Trust I, NOVA Financial Services and **PBB Property Holdings, LLC**"), Paralegal and Legal Liaison ("Responsible for corporate governance, contract review and negotiation, regulatory compliance and coordination of legal matters with outside counsel"), and, of greatest interest here, **Director** of REO (Real Estate Owned) for Nova Bank and **PBB Property Holdings, LLC** ("Assumed role of Director of REO Portfolio Management in 2010. Responsible for management and disposal of $5 million in REO assets, which included residential and commercial tenant occupied properties."). (Emphasis added). Thus, Ms. Hartline was personally in charge of the disposition of the Rossi-company properties mortgaged to both Nova and Leesport/VIST. Ms. Hartline's extensive areas of responsibility, her less than suitable background (her prior background was as a corporate paralegal), and the multiple potential conflicts apparent in her situation suggest that the Nova efforts to sell the mortgaged properties must be viewed more carefully.

As Exhibit G and the supporting records show, the 15 Nova properties sold by PBB had a total assessed value of $1,024,000. PBB, under Ms. Hartline's management, sold these properties for $329,500, less than a third of their assessed value.[6] Given the serious questions presented by PBB's management, operation and results, it is appropriate for the Court to credit Rossi with $694,500, being the difference between the assessed value and the sum actually recovered by PBB ("Undervalue Sales by PBB" on Exhibit G).

Second, the FDIC report says that thirteen properties with assessed value totaling $1,090,400 were "charged off by Nova Bank pre-failure." Thus, these properties were treated as uncollectible

---

1. [6] Although fully reliable information is not available, it appears that the general view of real estate professionals is that Philadelphia's residential property assessments almost uniformly *under*state fair market value.

9

assets and no effort was made to sell them. Given her positions at the bank, the decision to "charge off" these properties should principally have been made by Ms. Hartline.

Of the thirteen properties, eight are in the hands of Anthony Serrano today. Serrano was of course the government's uncharged star witness against Dean Rossi. Most of those were conveyed to Serrano by forged deeds. The deeds purport to be from R&S Properties, the Rossi-Serrano partnership. However, they were not signed by Rossi, the only authorized signatory. At trial, Serrano claimed they were also not signed by himself. Notwithstanding these forged deeds, Serrano continues to this day to control and collect rents on all of the properties save one, and that property was sold by Serrano for his own benefit in 2009. Without explanation, neither Nova nor the FDIC has taken any action to execute on the bank's interest in the seven remaining properties or to secure any compensation from Serrano.

Third, as was the case with the Leesport/VIST loan, the creditor bank took no action to recover its loss in any situation where the first lienholder foreclosed. The "Equity Abandoned" columns in Exhibit G total this default to be $247,200 for Nova. This abandonment again took place during the time when Ms. Hartline was Director of both REO for Nova and PBB.

Because the credits of $1,959,400 which must be applied substantially exceed both the original loan amount of $1.65 million and the amount of the judgment that both the government and the PSR rely upon ($1,591,032.69), the Nova loss for Sentencing Guidelines purposes is $0. The Court will also note that R&S, a Rossi-related company (per the government) made payments to Nova of $409,073.23.

    C. Summary

Consequently, the Court should find that the total "loss" amount for Sentencing Guidelines purposes is the $224,201.56 sustained by Leesport/VIST itself. Consequently, 10 points rather than 16 points should be added.

II. SECTION 3553(a) FACTORS

In 2011 the Supreme Court held that:

> [S]entencing judges "exercise a wide discretion" in the types of evidence they may consider when imposing sentence and that "[h]ighly relevant--if not essential--to [the] selection of an appropriate sentence is the possession of the fullest information possible concerning the defendant's life and characteristics." *Williams v. New York*, 337 U.S. 241, 246-247 (1949). Congress codified this principle at 18 U.S.C. § 3661, which provides that "[n]o limitation shall be placed on the information" a sentencing court may consider "concerning the [defendant's] background, character, and conduct," and at § 3553(a), which sets forth certain factors that sentencing courts must consider, including "the history and characteristics of the defendant," § 3553(a)(1).
>
> \*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
>
> "It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Koon v. United States*, 518 U.S. 81, 113 (1996). Underlying this tradition is the principle that "the punishment should fit the offender and not merely the crime." *Williams*, 337 U.S. at 247; see also *Pennsylvania ex rel. Sullivan v. Ashe*, 302 U.S. 51, 55 (1937) ("For the determination of sentences, justice generally requires consideration of more than the particular acts by which the crime was committed and that there be taken into account the circumstances of the offense together with the character and propensities of the offender").

*Pepper v. United States*, 562 U.S. 476, 480, 487 (2011). The additional factors discussed below should be considered by the Court in determining the sentence it will impose under section 3553(a).

18 U.S.C. §3553(a) provides that "[t]he court shall impose a sentence sufficient, *but not greater than necessary*" to satisfy the purposes of sentencing. (Emphasis added). The following factors listed in section 3553(a) are of particular relevance.

    A.    "The Nature and Circumstances of the Offense"

The factors discussed in section I of this memorandum, relating to the calculation of "loss," are also germane to the Court's evaluation of the offense conduct itself. Rossi certainly

11

did not intend or even anticipate that he would be unable to make the payments necessary to keep the loans to the three banks current and also to retire the other debt on the properties. It would have made no sense for him to enter into borrowing relationships that he knew would fail. He hoped and expected to be able to collect sufficient rents to pay the debt service and other expenses and eventually sell the properties and pay off all of the debt. In the two years between the closing of the loans and the onset of the financial crisis, he did just that, paying the three banks almost a million dollars. Were it not for a global economic downturn of historic proportions, this case might never have been brought.

The jury determined that the effects of the economic crisis did not absolve Rossi of criminal responsibility for his actions, and even if the Court adopts his position regarding the Offense Level computation, he faces the prospect of a federal prison sentence. But those events unquestionably mitigate the venality of Rossi's acts. Many questionable business transactions became catastrophes during the downturn. It is entirely appropriate for the Court to take this into account in fashioning a sentence.

      B.      "The History and Characteristics of the Defendant"

Prior to and since his involvement in the matters charged here, Dean led an entirely law-abiding life. In a time when military service was not compulsory, Rossi enlisted in the United States Navy after high school and served with distinction for over four years. Because of his trustworthiness, he earned high level security clearances and was trusted with matters of great significance.

A devoted husband and father, Dean has been married to Karen for 29 years. Dean and Karen raised two productive, supportive, loving children. Young Dean is a Marine Corps reservist, following in his father's footsteps.

III. CONCLUSION

It is likely not a coincidence that the two banks that relied principally on PBB Property holdings LLC to execute on the equity in the mortgaged properties recovered only a small fraction of the amount leant and that the one bank that did not recovered virtually all. By applying both the specific language and the principles of the quoted Application Notes, the Court must conclude that the true Guidelines "loss" is negligible.

Respectfully submitted,

Dated: April 23, 2019

Edward F. Borden, Jr.
**EARP COHN P.C.**
123 South Broad Street
Suite 1030
Philadelphia, PA 19109
(215) 963-9520
(856) 385-7060 (Direct Facsimile)
eborden@earpcohn.com

Counsel for Defendant Dean Rossi